**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                             )
UNITED STATES OF AMERICA                     )
                                             )
                                             )
v.                                           )   Criminal No. 08-10071-RGS
                                             )
                                             )
BRIMA WURIE,                                 )
                                             )
            Defendant                        )
_____)

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant submits this memorandum in support of a sentencing recommendation of 12 and one-half years' imprisonment. This recommendation invites the Court to determine that at least two of the predicate convictions which qualify him for the Armed Career Criminal recidivist sentencing enhancement are not in fact predicates, as argued in the Defendant's objections to the PSR.[1] A 12 and one-half year sentence is more than four times as long as Mr. Wurie's longest prior period of incarceration; the proposed sentence takes into account the gravity of the instant offense and its recidivist nature, while adhering to the overarching parsimony principle, which dictates that sentences be no longer than necessary to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). Furthermore, this recommendation is closer to the advisory guideline range that would have applied had Mr. Wurie pleaded guilty. Defendant argues this is a more appropriate guidelines touchstone, as undersigned counsel has uncovered evidence suggesting his trial counsel's performance was constitutionally deficient in failing to convey plea offers to the Defendant early in the case, or to adequately counsel the Defendant

---

[1] If the Court find the Defendant to be ACC, Defendant recommends the Court impose the mandatory minimum sentence of 15 years.

during the pendency of the case as to whether it was in his interest to plead guilty, rather than proceed to trial.

The evidence at trial established that Mr. Wurie sold crack cocaine to Fred Wade by car delivery. Police questioned Wade, and based on this interview, arrested Wurie. They also used information provided by Wade to obtain a warrant to search Mr. Wurie's residence, where they found the stash of crack cocaine and the Smith & Wesson pistol at the center of this case.[2]

Mr. Wurie's family background.

As the PSR reflects, Mr. Wurie is the only member of his family with any involvement with the criminal justice system. PSR ¶ 85. In fact, his family background makes Mr. Wurie's criminal activity all the more dismaying, and ultimately mystifying. In the course of preparing the case, undersigned counsel has interacted with numerous members of Mr. Wurie's family, including interviewing his parents and all but one of his siblings.[3] What emerged from these interviews is the fact that Mr. Wurie continues to enjoy the emotional support of an extraordinary and devoted family--he is not estranged from them. What also emerges is a portrait of a family dominated by a strict and powerful father figure, against whose high expectations his son, for perhaps unfathomable reasons, staged a prolonged rebellion, a sort of anti-achievement. While this account of the son is not mitigating in a straightforward way, it does help explain his

---

[2] The police located the residence at 315 Silver Street by taking a number from Wurie's cellphone, and performing a reverse phone number look-up on the internet. Finding this number required police to search the device—to press the keys necessary to reveal the number associated with the label "My House" in the phone. This Court upheld that search. Any challenge to the adequacy of the affidavit to support a search of the house was waived by then-counsel John Benzan. Mr. Wurie was convicted of the three counts of the indictment after trial.

[3] These interviews were conducted over the course of several days during June, 2011, and were videotaped. Unedited copies of the interviews have been provided to the government contemporaneously with this memorandum. Copies are available for the Court if the Court desires to view them. Citations to time stamps in interviews are closely approximate.

behavior, and holds out the promise that Mr. Wurie has both external and internal resources to return to the fold, and be successfully rehabilitated, once he serves his sentence.

Mr. Wurie's father Brima Wurie, Sr., 62, is a native of Sierra Leone. Mr. Wurie immigrated to the United States in 1970, and attended and graduated from American International College in Springfield, Massachusetts. [Brima Wurie, Sr., Interview, 6/2/11, at 17:30.] He subsequently earned a master's degree from Boston State College in political science, and spent his career as an administrator and dean of students at M.I.T. Mr. Wurie's family is highly esteemed in Sierra Leone; and his family has counted numerous high level civil servants in government, including an ambassador to Germany and cabinet level ministers. [Id. at 3:18, 4:20.]

Mr. Wurie, Sr., met his wife, Marilyn, then a recent immigrant from Trinidad, in Boston shortly after coming to the US. After courting for several years, they married, and started a family in Dorchester, in a stable neighborhood around 51 Speedwell Street, which is still the family home. There are five siblings: Khadi, 39, Nichole, 36, Julie, 34, Brima, Jr., 33, and Brandon, 24. All the siblings except Mr. Wurie have college degrees. Khadi is a graduate of Wellesley College, and is a human resources professional; the other sisters are school teachers, while Brandon, the youngest, is a teacher's assistant.

Mr. Wurie, Sr., reports that his parenting style was a "blend" of his African heritage and American mores. [Wurie, Sr. Interview at 30:22]. He placed a firm emphasis on personal discipline and academic success. [Id.] Both parents employed corporal punishment. [Marilyn Wurie Interview, 6/14/11 at 7:30.] The sisters Khadi and Julie Wurie remember inequities in their upbringing: BJ, as he was known, received material things, such as video game players,

which the girls did not have.  The sisters, sensing his advantaged position as a favored only son, blamed him for things which were not his fault.  [Khadi Wurie Interview, 6/10/11 at 8:30.]

Wurie recalls a different experience of childhood in the household, where he, as the boy and his father's namesake, was the child typically subjected to physical discipline, which was rarely if ever meted out to his sisters.  PSR ¶ 84.  Khadi, the eldest, believes extraordinary expectations were placed on him as the first son.  [Khadi Wurie Interview, 6/10/11 at 7:30.]

All five of the Wurie children attended the Reading, Massachusetts, public school system through the Metco Program, which buses urban public school students to suburban districts.  Both Khadi Wurie and her sister, Julie, describe the long days associated with being a student in this program, which involved bus trips as long as two hours in the mornings and late evenings, after extra-curricular activities.  [Khadi Wurie Interview, 6/10/11 at 11:56; Julie Wurie Interview, 6/21/11 at 3:00.]  Ultimately, Brima did not succeed in this environment, whereas his sisters did.  He withdrew from the Metco program, and entered the Boston Public Schools, ending up at South Boston High.  Although it appears he enjoyed some success at South Boston, including playing on a successful basketball team, in the context of the Wurie family, Wurie's withdrawal from the program can only be described as an extraordinary reversal. [Julie Wurie Interview, 6/21/11 at 7:47 ("it was big.")]   Julie, his closest sibling, while noting he at times appeared to be thriving at South Boston, also dates his withdrawal from Reading as the beginning of his association with negative peers and stereotypes.  Yolanda Walker, his girlfriend and the mother of his daughter, Summer, noted that his subjective memory of this period is one of inequity, of his parents not coming to his basketball games and favoring the daughters over him, of not measuring up.  [Yolanda Walker Interview, 6/22/11.]

4

Wurie's sister, Julie, a Boston public school teacher who majored in psychology, noted in her interview the insoluble nature versus nurture conflict, and thought BJ's turn toward crime was mostly environmental. [Julie Wurie Interivew, 6/20/11 at 18:30] Mr. Wurie's turn to criminal activity is evidently rooted in some deep-seated rebellion against the authority of his father[4] . Julie noted that when he transferred to the Boston Public Schools, no longer were his entire days taken up with school and transportation to and from school. Rather, he had long stretches of free time in the neighborhood, and at this time developed a peer group among neighborhood boys. That is, when this deep-seated rebellion played out, the form it took was powerfully determined by his peers in his neighborhood, and their expectations, rather than his parents'.

Mr. Wurie's girlfriend remains devoted to him; Mr. Wurie maintains daily telephone contact with his daughter, Summer, now almost 4, who has not seen him in person since his arrest. Nevertheless, they maintain a close and real connection.

It goes without saying that the Wurie family's grief and disappointment in BJ is boundless. Nevertheless, they remain supportive of him. The sentence imposed on Mr. Wurie will also be a sentence imposed on his family. The Defendant, in proposing the twelve and a half year sentence rather than the government's recommendation of twenty-two years, is influenced by the concept of proportionality as well as diminishing returns. A sentence of significant length, more than four times as long as any prior sentence he's served, but which still affords some opportunity for Mr. Wurie to rehabilitate himself and successfully rejoin the family which

---

[4] Notably, BJ was not the only Wurie sibling to exhibit rebellion from familial authority. In her interview, Khadi, the oldest sibling, recounted that she had a child while still in high school. Her parents responded by sending her to live with a relative out of state, while claiming to her school she was in Africa. When she returned, she had another child, she reports, on purpose. After staging this rebellion, however, Ms. Wurie later entered Wellesley College as a single mother, and successfully graduated. [Khadi Wurie Interview, 6/10/11 at 28:00.]

stands ready to surround him, provides adequate punishment for the offense and would be reasonable and just under the circumstances. *See United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) ("[A] major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses.")  A longer term is not likely to enhance Mr. Wurie's rehabilitation or reintegration after his term of incarceration, and may work at cross-purposes to these goals.  *See* Lynne M. Vieraitis, Tomaslav V. Kovandzic,Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Public Policy 589 (2007).at 590 (noting research suggesting "the routinization and restriction of prison life may increase the likelihood of reoffending postrelease when offenders find it difficult to transition to life on the outside, especially as the amount of time served increases.")

       The Guidelines Calculation.

       As outlined in Defendant's Objections to the PSR, the Defendant objects to his classification as a Career Offender and Armed Career Criminal.

       The Effectiveness of Mr. Wurie's Prior Counsel and Impact on the Sentence

        While the parties engaged in plea negotiations early in the case, Mr. Wurie claims he was not advised of these conversations, and the extrinsic evidence discussed below documenting a lack of communication between counsel and client support this claim.   According to AUSA John Wortmann and John Benzan, Mr. Wurie's trial counsel, the possibility of a negotiated plea contemplating a substantial prison sentence was discussed early on in this case.  The government

has not provided specific information as to what was discussed; Mr. Benzan has no recollection of the specifics of the negotiations either, but maintains that he conveyed the substance of these conversations to the Defendant.  Defendant denies that this information was conveyed to him.  Defendant takes the further position in this memorandum that this was a case in which significant effort should have been expended in litigating the motion to suppress, and once this was lost, it was manifestly in Mr. Wurie's interest to enter a plea, while attempting to preserve his right to appeal the motion to suppress.   Mr. Benzan's failure to adequately advise Mr. Wurie of the merits and demerits of going to trial at this stage of the case was ineffective assistance which prejudiced him.

In the course of representing Mr. Wurie, undersigned counsel has obtained Mr. Benzan's complete file.  Notably, there is there is not a single piece of correspondence in the file from Mr. Benzan to Mr. Wurie.  Mr. Wurie maintains that Mr. Benzan never wrote him, never accepted a phone call from him, and that he visited him only twice during the course of the case: once, briefly, in order to obtain an affidavit in support of the motion to suppress, which Benzan had neglected to submit with his motion; second, the evening before trial, for approximately an hour and twenty minutes.   Records obtained from Plymouth County House of Correction confirm this startling lack of communication. See Exh. A.[5]   Mr. Wurie's loved ones—including his mother,

---

[5] The first of the visits took place on Monday, September 8, 2008.  In a motion, Benzan stated the purpose of the meeting, which lasted from 2:07 p.m. to 2:37 p.m., was to review the motion to suppress with Wurie and have him sign an affidavit.  "Motion for Leave to File Motion to Suppress Late," 9/15/2008, D.E. 19  (The affidavit appears to have been signed by Wurie, but dated, incorrectly, by Benzan, as having been signed on September 11, 2008.)  The second visit took place one year and four months later.  Trial began on Monday, February 22, 2010.  The PHOC logs indicate Benzan visited with Mr. Wurie on February 21, 2010 from 5:43 p.m. to 7:05 p.m.  It is unclear how much of this hour and twenty minute period was taken up with a visit between Benzan and Wurie, however.   Yolanda Walker made a visit that evening, and the time periods of the visits overlapped.  Ms. Walker visited from 6:32 p.m. to 8:19 p.m.  Since attorney

Marilyn Wurie (who paid Mr. Benzan his fee), and his girlfriend, Yolanda Walker—also recount a history of frustration in their near complete inability to get in touch with Mr. Benzan during the course of the case.

Benzan's theory at trial was incoherent.  As the government effectively pointed out in closing argument, Benzan argued inconsistently that the police failed to adequately investigate the case and rule out a person whose name appeared on the mailbox at 315 Silver Street as a suspect, while at the same time suggesting that Wurie was the target of a sophisticated set-up in which the drugs were planted in the apartment, in retaliation for Wurie's involvement as a witness in a law suit against the Boston Police Department.  Neither theory adequately challenged the government's proof.  As to the first theory, while utility bills were found in the apartment in the name of "Manny Cristal," a person the government's evidence suggested did not even exist, utility bills in Mr. Wurie's name were also found.  The girlfriend, Ms. Walker, told police the night of Mr. Wurie's address that he was her boyfriend, often stayed there, and had been there the night before.  Also, he was confirmed to be the father of her two month old baby.  She was not called to testify by either side.  The second theory—that police malevolently set Mr. Wurie up, either by planting evidence or by failing to locate the true culprit as retaliation for his participation in a lawsuit--was inconsistent with the first, and was weakly presented through cross-examination.  The nature of the lawsuit was unexplored, and there was no factual predicate for the theory (such as proof that any of the officers who testified against Wurie were even aware of the lawsuit.)

---

visits and personal visits take place in different areas of the facility, the visits could not have occurred simultaneously.

While it is a defendant's right to decide whether or not to go to trial, there is some minimum of advice, counseling, which must take place so that the decision is well-informed. *See e.g., Lafler v. Cooper*, 376 Fed. Appx. 563 (6th Cir. 2010) (upholding the grant of habeas relief based on inadequate advice during plea negotiations where defendant subsequently went to trial), cert. granted,–– U.S. ––––, 131 S.Ct. 856, 178 L.Ed.2d 622 (2011) (10–209).  Counsel has an obligation to advise the defendant of all the consequences of going to trial, including its potential impact on sentencing should he be convicted.  *See Kerr v. Thurmer*, 639 F.3d 315, 328 (7th Cir. 2011), *Magana v. Hofbauer*, 263 F.3d 542, 547 (6th Cir. 2001).   At a minimum, counsel should convey plea offers in a meaningful way.  *See Missouri v. Frye*, ––– U.S. ––––, 131 S.Ct. 856, 178 L.Ed.2d 622 (2011) (companion case to *Lafler v. Cooper*, where plea offer was not conveyed).  Mr. Wurie claims he did not receive this constitutionally adequate advice, and the available evidence appears to supports this claim.

Mr. Benzan's performance as it appears on the public docket lends credibility to claims he was ineffective in counseling Mr. Wurie regarding the pivotal decisions in the case.  The Court invited Mr. Benzan to draft a memorandum in support of the Defendant's argument that the search of the cell phone was not justifiable pursuant to the search incident to arrest exception to the warrant requirement, but no memorandum was forthcoming.  In addition, Mr. Benzan waived any arguments he might have had to challenge the sufficiency of the affidavit in support of the search warrant.  Further, Mr. Benzan appeared to essentially abandon the case after the verdict.  The probation officer reported appearing for a scheduled presentence interview at the jail, and being informed by Mr. Wurie that he desired to participate in the interview, but in the presence of counsel.  This incident ultimately led the government to request a hearing on the status of Mr. Wurie's representation, in which the government noted Mr. Benzan was not

"return[ing] Probation's calls because he apparently intends to file a motion to withdraw." "Motion for a Status Conference," May 5, 2010, D.E. 50, at 1.    Mr. Benzan did not appear at the status conference to address the matter, and ultimately the Federal Defender's Office was appointed to represent Mr. Wurie.

We present this information at the sentencing stage of the case, because the issue of whether Mr. Wurie was effectively counseled has an impact on the weight to be given to the Career Offender sentencing range of 262 to 327 months calculated by Probation.  Had Mr. Wurie pleaded guilty, the guideline range, adjusted for acceptance of responsibility, would have been 188 to 235 months.  Defendant suggests that this range is a better measure of the true "worth" of the case, and so is a better gauge of a reasonable outcome than the guideline range after trial. For the reasons discussed above, Defendant requests a sentence somewhat below this guideline range, twelve and one half years or 150 months.

                                          Respectfully submitted,
                                          **BRIMA WURIE**,

                                          By his attorney,

                                          /s/ Ian Gold
                                          Ian Gold (BBO# 665948)
                                          Federal Defender's Office
                                          51 Sleeper Street, 5th FL
                                          Boston, Massachusetts 02210
                                          (617) 223-8061 (phone)
                                          (617) 223-8080 (fax)

Date:  June 28, 2011

**CERTIFICATE OF SERVICE**

      I, Ian Gold, hereby certify that this document will have been served on the registered parties and on Probation on this date through the Court's electronic filing system.

/s/Ian Gold
Ian Gold